(C. D. 1563)

CENTRAL VERMONT RAILWAY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 3, 1953)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before OLIVER and MOLLISON, Judges

MOLLISON, Judge: These protests are directed against the action of the collector of customs in assessing duty at the rate of 7½ per centum ad valorem under the provision in paragraph 407 of the Tariff Act of 1930, as modified by the Mexican Trade Agreement, T. D. 50797, for "packing-box shooks, of wood, not specially provided for," upon merchandise which is described on the invoices as "Lumber (Spruce) Dressed," or as "Spruce Lumber, Dressed." The claim in each of the protests is for duty at the rates applicable to sawed spruce lumber under paragraph 401 of the said act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and section 3424 of the Internal Revenue Code, as modified by the said agreement, to wit, 25 cents and 75 cents per thousand feet, board measure, respectively.

Basically, it is the plaintiff's contention that the processes to which the merchandise had been subjected prior to importation had not made it into packing box shooks, and that, in its imported condition, it was nothing more than lumber known as short dimension stock.

At the outset, it should be noted that on behalf of the plaintiff it was conceded that the merchandise covered by entries 4038 and 4507, which was assessed with duty at the 7½ per centum rate, actually consisted of shooks, and the protests were abandoned insofar as they related to those two entries.

As to the nature and condition of the remainder of the imported merchandise assessed at the 7½ per centum rate, the record shows the following: The ultimate consignee of the merchandise in question, A. W. & W. M. Watson Co. of Newtown, Pa., a firm engaged in the manufacture of architectural woodwork and industrial woodwork, including boxes, had a contract with the United States Government for the manufacture of ammunition boxes. In the fulfillment of that contract, it operated under a blueprint or plan, a copy of which is in evidence as plaintiff's exhibit 3, which showed the detailed construction of the box.

Part of the wood materials which were to go into the construction of the box was ordered by the Watson Co. from the exporter of the

merchandise here involved under a purchase order, a copy of which is in evidence as plaintiff's exhibit 1. In the body of the order are recited certain sizes in inches, viz,

$$\frac{3}{4} \times 6\frac{5}{8} \times 14\frac{15}{16},$$
$$\frac{3}{4} \times 10\frac{1}{8} \times 13\frac{1}{4},$$
$$\frac{3}{4} \times 6\frac{5}{8} \times 8\frac{3}{4},$$

and the order called for lumber sawed to the minimum sizes or in multiple-length pieces to cut the minimum sizes given.

David L. Watson, general manager of the ultimate consignee, testified that the merchandise ordered and actually imported was larger in width and length than the pieces of wood which were ultimately to go into the boxes and that the sizes to which it was cut after importation and before it was put into the finished boxes were as follows:

$$\frac{3}{4} \times 6\frac{1}{4} \times 14\frac{3}{16}$$
$$\frac{3}{4} \times 10\frac{1}{16} \times 12\frac{15}{16}$$
$$\frac{3}{4} \times 6\frac{1}{4} \times 8\frac{1}{16}$$

Mr. Watson also testified that the imported pieces of wood would not make up into boxes of the original dimensions, and that, if attempt had been made to make up boxes from the wood in its imported dimensions, the result would have been a crooked box, as the allowance for cutting was greater in the case of the sides than it was in the case of the tops and bottoms.

The witness stated that the merchandise in its condition as ordered and imported was what is known in the lumber trade as "short dimension stock"; that, as imported, each bundle contained one size of pieces, 10 to 15 to the bundle, and that in the case of the wider pieces two or more pieces, tongued and grooved so as to fit together to make the width, were sometimes supplied rather than a solid piece. Such tongued-and-grooved pieces were placed next to each other in the bundles and were joined together after importation to make the wide piece.

Both parties are apparently agreed that the definition of the term "shook," as contained in Webster's New Collegiate Dictionary, Fifth Edition, 1948, viz,

A set of parts of boxes, tops, bottoms, sides, and ends, ready to be put together,

is a correct definition of the term. However, it is clear that the parties do not agree upon the meaning to be given to the term "ready" in the quoted definition. It is the plaintiff's contention that because further work had to be done on the pieces of wood before they could be assembled into boxes, namely, cutting or trimming to exact size, they were not "ready" to be put together. It is the defendant's contention that any trimming or squaring performed upon pieces of wood, otherwise ready to be assembled into a box, would not remove them from the classification of "shooks."

We are of the opinion that the authorities, both lexicographic and judicial, favor the contention of the plaintiff. The sense of the term as conveyed by those dictionaries and decisions which the court has consulted is of parts ready to be made into boxes by mere assembly or nailing, with nothing remaining to be done to the parts themselves. Thus, the applicable definition in Funk & Wagnalls New Standard Dictionary, 1942, is—

A set of boards *in order for nailing together into a packing-box*, and conveniently bundled for transportation. [Italics added.]

The Century Dictionary (1890–91) thus defines the term:

A set of staves and headings sufficient for one hogshead, barrel, or the like, *prepared for use* and bound up in a compact form for convenience of transport. Boards for boxes *prepared or fitted for use* and packed in the same way bear the same name. [Italics added.]

In *Washburn* v. *City of New Orleans et al.*, 9 So. 37, a decision of the Supreme Court of Louisiana, on appeal from a civil district court, one of the issues presented was whether certain shooks were "articles of wood" and, hence, exempt from taxation under a constitutional provision therefor. The appellate court cited with approval the following from the decision of the district court:

\* \* \* shooks are articles of wood ready for use by the consumer, who has but to put them in boxes. *They need no further manipulation or labor on them as shooks*, precisely as is the case of sashes, windows, and blinds, which also require as such no further manipulation or labor, but must nevertheless be put up for use. [Italics ours.]

and went on to say:

\* \* \* True, shooks are not wooden boxes, but they are "articles of wood,"— articles cut by machinery from sawed planks, and fashioned into shapes and sizes *suitable for making boxes by the simple process of nailing them together*. [Italics ours.]

To a like effect is the decision of this court in the case of *Canadian Pacific Railway Co.* v. *United States*, 35 Treas. Dec. 354, Abstract 42558, wherein the court said:

\* \* \* in the condition imported the pieces of lumber involved are not ready for use as parts of boxes. In other words, they are not shooks at all.

See also the decision in the case of *A. W. Fenton, Jr.* v. *United States*, 41 Treas. Dec. 518, Abstract 44764, wherein it appeared that nine pieces of different sizes were required for constructing a crate, only one of such sizes being imported, and it was held that the imported wood was not classifiable under the provision for "shooks."

In our judgment, the pieces of wood here involved had not at the time of importation reached the stage of manufacture at which they could be properly called "shooks." The evidence indicates that they are nothing more than spruce lumber which had been sawed to certain dimensions, and, in some cases, tongued and grooved. While it is

true that the lumber had been sawed to specific dimensions which made it particularly suitable for further manufacture into ammunition boxes, we do not believe it was thereby taken out of the provision in paragraph 401 for sawed spruce lumber, including such lumber when tongued and grooved.

The situation is similar to that which obtained in the case of *John A. Hunter Hardwood Corp.* v. *United States*, 21 Cust. Ct. 139, C. D. 1143, wherein we held that dagame wood, or lemonwood, sawed and squared to common dimensions, although suitable and desirable for use in making archery bows, was, nevertheless, classifiable under the provision for sawed lumber.

Judgment will therefore issue sustaining the protest claim in each case with respect to the merchandise involved, other than that covered by entries 4038 and 4507, as to which entries the protests are overruled.